UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | | |
|---|---|---|
| JOHN S. JOHNSON, | ) | |
| | ) | |
| Petitioner, | ) | Civil Action No. 08-194-ART |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| GARY BECKSTROM, Warden, | ) | **& ORDER** |
| | ) | |
| Respondent. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

John Johnson is serving a life sentence for first-degree murder in a Kentucky state prison. He filed a voluminous petition for a writ of habeas corpus under 28 U.S.C. § 2254.  R. 1. Because all of the claims he advances lack merit, Johnson's petition is dismissed.

## BACKGROUND

His trial began on July 12, 1993, in the Leslie County Circuit Court.  John Johnson stood accused of murdering nineteen-year-old Brian Sizemore with an assault rifle.  The murder took place shortly before 11:00 p.m. on the night of July 16, 1992.  That night began as an ordinary one for the Sizemore family.  Brian was visiting his uncle, George Sizemore's, house.  Brian's father, Bobby Sizemore, was there too, along with other family and friends.  The guests were sitting around a table, shooting the breeze and drinking.  It was getting late, and Bobby had plans to take Brian boating out on the lake early the next morning.  Trial Transcript ("Tr.") 324.

Shortly after 10:00 p.m., John Johnson pulled up in front of George Sizemore's house in his red, two-tone Chevy pickup truck.  Johnson had already had four or five beers so far that evening, and he was angry.  Tr. 291, 309, 323.  George Sizemore said that Johnson stormed into

the house, took a pistol out of his belt, slammed it on the table, and yelled that he was looking for a man who had ripped off his girlfriend. Tr. 291. Bobby Sizemore remembered the same thing—he said that Johnson was looking for someone named Mearl Sharp, who Johnson believed had robbed his girlfriend. Tr. 323. Bobby tried to talk Johnson down, but Johnson would not cool off. Tr. 324. At some point, Johnson reached for the pistol on the table. Bobby reached for it too, and the two men struggled over possession of the weapon. *Id.* During the melee, the gun went off. The bullet hit George Sizemore's finger. Tr. 291. Bobby ultimately gained control of the gun, and he whacked Johnson over the head with it, opening up a gash over his eye. Tr. 680-83. Angry and bloodied, Johnson stormed out of the house, got into his pickup truck, and drove away. Tr. 325.

Witnessing the fight unsettled nineteen-year-old Brian. He told his father that he wanted to go home. Tr. 326. Leaving at that time turned out to be a fateful decision. About four minutes after Johnson had left, Brian walked out of the house, got into his black pickup truck, and began backing down the driveway. A few seconds later, Bobby heard what he thought were backfires coming from the road. Tr. 326. But they weren't backfires, they were gun shots. *Id.*; Tr. 294-96. Kathy Davidson, who also was at George Sizemore's house that night, said she saw the whole thing. She watched Brian back his truck down the driveway. Then she saw a red two-tone truck drive by, fire at least two shots toward Brian's truck, and then speed off. Tr. 363-65. According to her, it was the same pickup truck that Johnson had been driving. *Id.* Leah Cupp, who was thirteen years old at the time, lived near George Sizemore's house, closer to the road. She said that she saw Johnson's two-tone red pickup truck drive by, then heard the gun shots,

and then saw Brian's black truck idling in a ditch. Tr. 347. Bolstering the credibility of these eyewitness identifications, several people testified that the area was well lit that night—the moon was out, and porch lights from various houses also illuminated the driveway and the road. Tr. 320-21, 359.

Members of Brian's family rushed down the driveway toward his truck. Brian was slumped over the steering wheel. There was blood everywhere. Family members took Brian out of the truck, loaded him into another car, and drove him to the hospital. He never had a chance. As the medical examiner, Dr. Carolyn Coyne, confirmed, Brian died of a "penetrating gunshot wound to the head." Tr. 485. One of the bullets passed clear through Brian's brain, entering his left temple and exiting out the right side of his skull. Tr. 487.

Detective John Sizemore (no relation to the victim) was one of the first police officers to arrive at the scene. He peered into Brian's truck and saw that the front seat was covered with blood. Tr. 167. He recovered several shell casings, *id.*, and he also retrieved bullet fragments from the dashboard of the truck, a tree, and a wooden post on the property. Tr. 173, 175. Charles Lanham, a forensic specialist with the Kentucky State Police, arrived later. He photographed the truck and collected the shell casings for ballistics testing. After examining markings on the casings with a microscope, he determined that they were consistent with having been fired from a 7.62 x 39 millimeter SKS rifle. Tr. 415-16. John Napier, one of the state's witnesses, testified that he had seen Johnson earlier that afternoon with that exact kind of rifle in his truck. Tr. 274. Napier was sure of the weapon's caliber because Johnson had shown him a box of ammunition for the gun. Tr. 277-78.

Detective Sizemore returned to the scene a couple of days later and interviewed other witnesses. One of them was fourteen-year-old Michael Turner, one of George Sizemore's neighbors. Turner said that he ran out of his house when he heard the gunshots and saw the Chevy truck driving away. Tr. 531-32. He described the driver as having bushy hair and a beard. Detective Sizemore spread out several photographs of different individuals on the hood of his cruiser and asked Turner to identify the shooter. Turner quickly pointed at the photograph of Johnson. Tr. 517-19. Although he was unable to positively identify Johnson at trial, Turner did acknowledge that he had fingered Johnson during the prior photo lineup. Tr. 535.

Where was Johnson during all of this? Shortly after the murder, his brother, Randall Johnson, drove him to Hazard Hospital to receive treatment for the gash over his eye. The admissions clerk, Iva Simms, asked Johnson how the injury had happened. Johnson told her he had fallen out of a truck, but when Simms inquired further and asked whether the truck had been moving, Johnson became angry. Tr. 492. Tanya Pratt, a nurse at the hospital, recalled the same thing. Johnson was hesitant to say how he had been injured, but when pressed he said he had fallen out of a truck. Tr. 494-95. According to Pratt, Johnson was in an unusual hurry to leave. She told him that he needed stitches, but Johnson did not want to wait for the doctor, so he left with nothing but gauze covering the wound over his eye. Tr. 495.

After Johnson left the hospital, he disappeared for more than three months. Johnson admitted that he had no contact with his family during that time. At trial, Johnson said that his family "knew where I where, they just didn't know how to get ahold of me." Tr. 764. A grand jury indicted Johnson for the murder of Brian Sizemore on August 18, 1992. Finally, more than

three months after the shooting, Johnson turned himself in to authorities on November 2, 1992. Detective Sizemore made the arrest. Tr. 192.

After hearing all of this evidence over the course of a six-day trial, the jury convicted Johnson of murdering Brian Sizemore after deliberating for only twelve minutes. Tr. 1007. The jury recommended a life sentence. Tr. 1030. On July 26, 1993, the trial court formally sentenced Johnson to life imprisonment. Tr. 1078.

Because he received a life sentence, Johnson appealed his conviction directly to the Kentucky Supreme Court. *See* Ky. Const. § 110(2)(b) ("Appeals from a judgment of the Circuit Court imposing a sentence of death or life imprisonment or imprisonment for twenty years or more shall be taken directly to the Supreme Court."). He raised a number of errors. The Kentucky Supreme Court affirmed his conviction, *Johnson v. Commonwealth*, 892 S.W.2d 558, 563 (Ky. 1994), although it was closely divided (four-to-three) on two of Johnson's assignments of error. Three Justices would have granted Johnson a new trial based on the trial court's inclusion of a faulty missing-evidence instruction and the trial court's failure to dismiss a troublesome juror from the panel. *Id.* at 563-65 (Stumbo, J., dissenting).

Johnson then filed a motion in the trial court collaterally attacking his conviction under Kentucky Rule of Criminal Procedure 11.42. The trial court held three separate hearings on Johnson's motion before denying it in its entirety in a written decision issued on October 2, 2003, and amended on September 9, 2005. R. 24-38; 24-39. The Kentucky Court of Appeals affirmed, R. 24-47, and the Kentucky Supreme Court denied discretionary review. R. 24-51. Johnson then filed this habeas petition.

## ANALYSIS

A state prisoner seeking a writ of habeas corpus in federal court is like an Olympic hurdler. In order to reach the finish line and receive habeas relief, he must avoid tripping over three different hurdles in his path, each one more difficult to clear than the last. These hurdles—some imposed by statute, others judicially created—exist primarily to protect state sovereignty against unwarranted federal intrusion. When a federal court grants a writ of habeas corpus to a state prisoner, it "intrudes on state sovereignty to a degree matched by few exercises of federal judicial authority." *Harrington v. Richter*, 131 S. Ct. 770, 787 (2011) (quoting *Harris v. Reed*, 489 U.S. 255, 282 (1989) (Kennedy, J., dissenting)). Granting habeas invalidates a core exercise of a state's sovereign prerogative—the authority to punish those who break the state's criminal laws. Of course, states must implement their criminal laws in conformity with the United States Constitution. *See* U.S. Const. art. VI. But our federal system has long relied on a presumption that state courts act in "good faith" and will "honor the Constitution [and] obey the binding laws of the United States." *Alden v. Maine*, 527 U.S. 706, 755 (1999). In light of this presumption, the Supreme Court has time and again admonished that "state courts are the principal forum for asserting constitutional challenges to state convictions." *Richter*, 131 S. Ct. at 787; *see also Wainwright v. Sykes*, 433 U.S. 72, 90 (1977) ("[T]he state trial on the merits [should be] the 'main event,' so to speak, rather than a 'tryout on the road' for what will later be the determinative federal habeas hearing."). These three hurdles, therefore, play a critical role in protecting state sovereignty by ensuring that state courts have the first opportunity to address all constitutional claims. These hurdles demand that a state prisoner present all of his

constitutional claims to the state courts in the first instance and ensure that a writ of habeas corpus will issue only in the event of an extraordinary breakdown in the state's justice system.

The first hurdle is exhaustion of state remedies. If the petitioner has not presented a claim to the state courts and there is still an opportunity for him to do so, a federal court may not grant habeas relief. 28 U.S.C. § 2254(b)(1)(A); *see Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002). The second hurdle is procedural default. Habeas relief is precluded if the petitioner failed to present a claim to the state courts and no longer has an opportunity to do so, or if the state court refused to hear the claim because the petitioner failed to comply with a state procedural rule. *See Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). The third, and tallest, hurdle is the deferential standard of review that the Antiterrorism and Effective Death Penalty Act ("AEDPA") prescribes for claims adjudicated on the merits by the state courts. A habeas court may only grant relief on such claims if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or if the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Johnson asserts seventeen different claims (many with subclaims) in his petition. Some of his claims trip over the first hurdle, some trip over the second, and all of the rest trip over the third. None of Johnson's claims reach the finish line.

I.      **Failure to Exhaust State Remedies**

The first hurdle is failure to exhaust state remedies. AEDPA prohibits a federal court from granting habeas relief "unless it appears that the applicant has exhausted the remedies

available in the courts of the State." 28 U.S.C. § 2254(b). As the Court explained at length in a prior memorandum opinion and order, R. 98, Johnson's amended claim that a "biased" judge presided over his trial and post-conviction proceedings in state court has not been exhausted. Johnson never presented the claim to the Kentucky state courts, even though a forum remains available for him to do so. The Court therefore dismissed this claim. *Id.* Because Johnson's "biased" judge claim is the only claim that relies on newly-discovered evidence—and, hence, the only one that the Kentucky courts will still entertain at this late date—it is the only claim that trips over this first hurdle. As explained below, there are many other claims that Johnson did not fairly present to the Kentucky state courts. But because Johnson's opportunity to raise these claims in the state system has long since expired, these claims are exhausted. The exhaustion requirement only bars federal habeas review if state remedies are still available at the time the petitioner files his habeas petition. *See Williams*, 460 F.3d at 806 (citing *Engle v. Isaac*, 456 U.S. 107, 125 n.28 (1982)). If no state remedies are available, exhaustion poses no barrier to federal review. *See Gray v. Netherland*, 518 U.S. 152, 161-62 (1996) (citing *Castille v. Peoples*, 489 U.S. 346, 351 (1989)). Such claims, however, may be procedurally defaulted.

## II.  Procedural Default

The second hurdle on the way to habeas relief is procedural default. A habeas petitioner can procedurally default a claim in two ways. First, if he has not fairly presented a claim to the state courts and, at the time he files his habeas petition, state law no longer allows him to raise it in the state courts, the claim is procedurally defaulted. *See Williams*, 460 F.3d at 806; *Gray*, 518 U.S. at 162. This is the flip-side of the exhaustion rule. "Where state court remedies are no

longer available to a petitioner because he or she failed to use them within the required time period, procedural default and not exhaustion bars federal court review." *Williams*, 460 F.3d at 806. Second, a petitioner procedurally defaults a claim if he fails "to comply with state procedural rules in presenting his claim to the appropriate state court." *Id*. If the petitioner has procedurally defaulted a claim, a federal court can only grant habeas relief if the petitioner demonstrates "cause for the default and actual prejudice as a result of the alleged violation of federal law," or if he can "demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

Johnson has procedurally defaulted several of his claims in both ways. Some claims, he did not present to the state courts at all. Other claims, he presented to the state courts, but not in constitutional dressing. And yet other claims, he failed to present in compliance with state procedural rules.

### A. Claims That Johnson did not Present to the State Courts at All

Three of Johnson's claims involve ineffective assistance of appellate counsel. Johnson claims that his lawyer on direct appeal was ineffective because he did not appeal the trial court's denial of Johnson's motion to quash the indictment (Claim 1), its denial of Johnson's request to review a copy of the master jury list (Claim 2), or its failure to instruct the jury on lesser-included offenses (Claim 8(B)). As Johnson freely concedes, he never raised any of these claims in state court. *See* Memorandum of Law in Support of Johnson's Habeas Petition ("Memo"), R. 1-3 to R. 1-9 at 21, 26, 182. Nevertheless, Johnson argues that the Court should evaluate the claims because presenting them to the Kentucky state courts would have been futile.

It is true that Kentucky courts have not been hospitable to ineffective-assistance-of-appellate-counsel claims in the past. Over the years, the Kentucky Supreme Court repeatedly said that "ineffective assistance of appellate counsel is not a cognizable issue in this jurisdiction." *Parrish v. Commonwealth*, 272 S.W.3d 161, 173 (Ky. 2008); *Lewis v. Commonwealth*, 42 S.W.3d 605, 614 (Ky. 2001). But this perceived hostility to his claims did not excuse Johnson from presenting them to the Kentucky courts. As the Supreme Court said in *Engle v. Isaac*, "[i]f a defendant perceives a constitutional claim and believes it may find favor in the federal courts, he may not bypass the state courts simply because he thinks they will be unsympathetic to the claim." 456 U.S. 107, 130 (1982). After all, "[e]ven a state court that has previously rejected a constitutional argument may decide, upon reflection, that the contention is valid." *Id*. Indeed, that is exactly what happened in the Kentucky courts with respect to ineffective-assistance-of-appellate-counsel claims. The Kentucky Supreme Court recently reversed course and recognized such a claim in *Hollon v. Commonwealth*, --- S.W.3d ---, No. 2008-SC-000618-DG, 2010 WL 4679534, at *4 (Ky. 2010) ("We are thus persuaded that it is time . . . to recognize [ineffective-assistance-of-appellate-counsel] claims premised upon appellate counsel's alleged failure to raise a particular issue on direct appeal.").

*Hollon* illustrates perfectly the rationale underlying *Engle*'s requirement that a defendant must raise a claim in the state courts even if he believes the claim is likely to fail. State courts, like all courts, are fallible. *Cf. Brown v. Allen*, 344 U.S. 443, 540 (1953) (Jackson, J., concurring) ("[The Supreme Court is] not final because [it is] infallible, but [it is] infallible only because [it is] final."). Sometimes courts issue incorrect decisions. But state courts, like all

courts, also have the ability to recognize error and change. Therefore, even if state courts have not been hospitable to a claim in the past, a defendant must still present the claim to them. If the rule were otherwise, once the state courts issue an incorrect decision, defendants could simply bypass them and hold their claims for federal habeas review, thereby robbing the state courts of the opportunity to correct their mistake. Such a regime would permit "the type of deliberate bypass condemned in *Fay v. Noia*, 372 U.S. 391 (1963)." *Engle*, 456 U.S. at 130 n.35.

Accordingly, because Johnson did not present his ineffective-assistance-of-appellate-counsel claims to the Kentucky courts and his only opportunities for doing so have long since passed, they are procedurally defaulted. *See Williams*, 460 F.3d at 806.

### B.    Claims that Johnson did not Fairly Present to the State Courts

Even if a habeas petitioner has presented his claim to the state courts, that may not be sufficient on its own. It is not enough for the petitioner to simply mention the claim in an oblique manner or as a casual aside. Rather, the petitioner must "fairly present[]" his claims to the state courts. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999); *Slaughter v. Parker*, 450 F.3d 224, 235 (6th Cir. 2006). Although fair presentation does not require the petitioner to "cite 'chapter and verse' of constitutional law," *Slaughter*, 450 F.3d at 236, the petitioner must present his claim in sufficient detail to afford the state courts "the opportunity to see both the factual and legal basis for [the] claim." *Wagner*, 581 F.3d at 414-15. In other words, the petitioner must have presented his claims to the state courts in constitutional dressing. If he did not, the state courts never had "an opportunity to correct the constitutional violation in the first instance," *O'Sullivan*, 526 U.S. at 844-45, and the federal habeas court "lack[s] jurisdiction" to consider

the claim. *Blackmon v. Booker*, 394 F.3d 399, 400 (6th Cir. 2004). Two of Johnson's claims suffer from this defect.

First, in Claim 3, Johnson argues that the trial court "acted vindictively" by forcing a juror to remain sequestered with the jury panel despite his expressions of possible bias against Johnson. Memo at 37. Midway through the presentation of the evidence, one of the jurors, Rex Boggs, informed the court "that he felt he could not continue to sit as a juror because of what he considered to be unjustifiable delays." *Johnson*, 892 S.W.2d at 562. The trial judge held a brief *in camera* colloquy with Boggs on Saturday, July 17, 1993, to discuss his complaints. Tr. 506-10. Counsel for Johnson and the government were also present. Boggs told the judge that he strongly believed the trial "should not be delayed for any reason." *Id.* at 506. He further said that he was "not particularly concerned with this case to be quite blunt," but that he was more "concerned with when it's going to be over with." *Id.* at 508. Even more blatantly, Boggs said: "I don't believe I'm going to give fair weight to the defense because I am going to be wondering [about] getting out of here," and "I'm not sure I can make a fair judgment." *Id.* After Boggs said his peace, the judge asked Johnson's lawyer what he had to say. "I don't know," the lawyer responded, "I've never run into this situation before Judge." *Id.* at 509. The judge then said that he was "going to make [Boggs] sit through the rest of the trial even if you all have an objection to him serving. So you've got some time to think about whether or not you want to object to him; he will be here." *Id.* at 509-10. The trial resumed, and concluded, the following Monday. After closing statements were finished, Johnson's attorney asked the court to excuse Boggs from the jury as an alternate juror. Tr. 998. The court granted the request, noting during a bench

colloquy that Boggs had acted like he was not paying attention all day. Tr. 999-1000. The remaining twelve members of the jury then retired to deliberate. Twelve minutes later, they returned with a unanimous guilty verdict.

In his habeas petition, Johnson claims that the trial judge's decision to force Boggs to stay on the jury over the weekend was "vindictive" and that Boggs's presence "contaminated the remainder of the jury panel" and prejudiced them against him, thereby depriving him of his rights to due process and a fair trial. Memo at 37. The problem, though, is that Johnson did not present this claim in constitutional dressing to the Kentucky courts. In his brief to the Kentucky Supreme Court on direct appeal, Johnson introduced this claim with the following heading: "The trial court's vindictive insistence on leaving Juror Boggs with the sequestered jury was error and may well have contaminated the remainder of the panel thus explaining the 12 minutes guilty verdict." R. 24-18 at 14. The text of the section of the brief addressing this claim further argued that keeping Boggs on the panel was "vindictive and erroneous," that "it was prejudicial error to require [Boggs] to remain as a juror," and that Boggs's continued presence could have explained the quick guilty verdict. *Id.* at 16-17. Conspicuously absent from this section of the brief was any reference whatsoever to the constitution or federal law—no constitutional provisions, no state or federal cases applying constitutional law, not even the words "due process." R. 24-18 at 14-17. Although Johnson did include general references to "due process" in *other* portions of his brief, those references are too remote to constitute fair presentation of *this* claim. The heading for the first section of his brief states: "Johnson's trial and conviction under this indictment was a mockery of the due process clause of the United States

Constitution." R. 24-17 at 12. But that heading was on page six of the brief; Johnson did address the Rex Boggs issue until thirty-five pages later. Including a "catchall" reference to due process at the beginning of the brief is not sufficient to fairly present all claims in the brief in constitutional dressing. *See Blackmon*, 394 F.3d at 401. And although Johnson's argument that the trial court acted "vindictively" in forcing Boggs to remain on the panel is reminiscent of some constitutional claims, such as prosecutorial vindictiveness, the use of that lone word, with no reference to federal law of any kind, is not sufficient. *See Leon v. Sec'y, Dept. of Corr.*, No. 8:09-cv-1410-T-17MAP, 2010 WL 3467128, at *10 (M.D. Fla. Aug. 31, 2010) (habeas petitioner's argument that his sentence was "vindictive," unaccompanied by any citations to federal law, was insufficient to fairly present due process claim to state courts); *see also Wagner*, 581 F.3d at 415 ("[T]he applicant is required to make a *specific* showing of the alleged claim.") (emphasis added). Although the Court might be willing to read Johnson's direct-appeal brief more generously if Johnson had drafted it *pro se*, that simply was not the case. Johnson still had appointed counsel on direct appeal. *See* R. 24-18 at 21.

Further buttressing the conclusion that Johnson did not fairly present this claim, the Kentucky Supreme Court does not appear to have understood Johnson's claim in constitutional light. The court's decision on this claim cites to no federal law and simply says that there was "no error in the trial court's exercise of [its] discretion." *Johnson*, 892 S.W.2d at 563. That is not the language of a court that believed it was ruling on a constitutional claim.

The Sixth Circuit's decision in *Slaughter* confirms the deficiency of Johnson's presentation to the state courts. 450 F.3d at 235-36. The petitioner in that case claimed that the

state trial court denied him due process when it allowed a juror to question him. *Id*. at 235. The Sixth Circuit held that the petitioner had not fairly presented this claim to the Kentucky Supreme Court. *Id.* at 236. His state-court brief simply argued that the questioning was "improper" and cited to no federal cases, and the Kentucky Supreme Court's decision rejecting the claim simply held that the questioning was "proper" and made no reference to federal law. *Id.* Similarly here, the relevant section of Johnson's brief cites to no federal cases or federal law and the Kentucky Supreme Court clearly did not rule on the claim as a constitutional claim. Johnson therefore did not fairly present it to the state courts.

This is not to say that the Court condones the state court's handling of juror Boggs's complaints. There is something deeply troubling about allowing a juror who openly expressed such callous disregard for his role as a neutral fact-finder to continue to serve on the jury. But Johnson never gave the state courts an opportunity to decide this claim on constitutional terms. "If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution." *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995). Johnson did not do so here. Accordingly, he did not fairly present this claim to the Kentucky courts on direct appeal. Because he no longer has any opportunity to present this claim in the Kentucky courts, it has been procedurally defaulted. *See Williams*, 460 F.3d at 806.

Part of Claim 4 also suffers from a fair-presentation defect. In Claim 4, Johnson argues that his due process rights were violated because two jurors—Agnes Melton and Lillian Hayes—did not reveal their prior involvement with Johnson during voir dire. Melton, who is

a schoolteacher, brought her class to the courthouse to observe a trial in 1992. *Johnson*, 809 S.W.2d at 562. By twist of fate, Johnson happened to be the defendant in that trial (it concerned an unrelated matter). *Id.* Johnson also discovered that someone named Lillian Hayes had sat on the jury in his 1972 trial for shooting into an occupied dwelling (he was acquitted of that charge). *Id.* at 563. Johnson claims that neither Melton nor Hayes disclosed these facts when prompted to do so by questions posed during voir dire. Johnson raised Melton and Hayes's alleged misrepresentations in a motion for a new trial immediately after his conviction. App'x F at 414-22. After both parties declined to call witnesses during the post-verdict hearing, *id.* at 442, the trial judge denied the motion. The trial judge did "not find anything that establishes that Mrs. Melton intentionally made any mis-statement or withheld any information." *Id.* at 442. And the trial judge found nothing proving that Lillian Hayes was the same Lillian Hayes who served on Johnson's 1972 jury. *Id.* at 443-44. Even if she was the same juror, the trial judge did not believe that she gave any false answers with respect to a trial that happened twenty-one years ago. *Id.* at 444. Johnson appealed this ruling, and the Kentucky Supreme Court affirmed, finding "no abuse of discretion" in the trial court's denial of the motion for a new trial. *Johnson*, 809 S.W.2d at 562-63.

This claim too is procedurally defaulted because Johnson did not fairly present it in constitutional terms to the state courts. Similar to Claim 3 above, the section of Johnson's brief to the Kentucky Supreme Court on direct appeal dealing with jurors Melton and Hayes does not cite to any federal law whatsoever—no provisions of the constitution, no cases, not even the words "due process." R. 24-18 at 17-18. Johnson's reply brief, R. 24-20 at 11-12, and his

petition for rehearing, R. 24-21 at 9-10, are similarly devoid of any constitutional argument concerning this claim. And, again like claim 3, the Kentucky Supreme Court's decision rejecting the claim did not cite to any federal law. The state high court merely "f[ound] no abuse of discretion" in the trial judge's denial of the motion for a new trial. *Johnson*, 892 S.W.2d at 563. Therefore, because Johnson did not fairly present this claim to the state courts, it, too, is procedurally defaulted. *See Williams*, 460 F.3d at 806. Johnson also advances an ineffective-assistance-of-counsel claim related to Claim 3. Because that claim was not procedurally defaulted, it is discussed below.

### C.   Claims that Johnson did not Present to the State Courts in Compliance with State Procedural Rules

Finally, even if a habeas petitioner fairly presented a claim to the state courts, the claim may be procedurally barred if he failed to present it in accordance with state procedural rules. Federal courts generally may not grant habeas relief on a claim that the state courts rejected "on a state law ground that is independent of the federal question and adequate to support the judgment." *Beard v. Kindler*, 130 S. Ct. 612, 614 (2009) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)). If the state courts refused to review a claim because of a state-law procedural barrier, habeas relief is generally barred. *See Walker v. Martin*, 131 S. Ct. 1120, 1127 (2011) (citing *Wainwright v. Sykes*, 433 U.S. 72, 81-82, 90 (1977)). There is one narrow escape valve from this procedural-default rule: A habeas court may still review a claim that has been procedurally defaulted if the petitioner demonstrates "'cause' and actual 'prejudice' or that he is 'actually innocent.'" *Bousley v. United States*, 523 U.S. 614, 622 (1998). Several of Johnson's claims run aground on this procedural-default shoal.

In Claims 5(A), 5(B), 5(C), and 5(F)(i), Johnson complains of various instances of prosecutorial misconduct. He argues that prosecutors "took the posture of representing the Sizemore family rather than the Commonwealth of Kentucky"; failed to correct testimony about the moon's position on the night of the murder that they knew to be false; and improperly asked him about a prior felony conviction during cross-examination. Memo at 64-76, 94-110. The Kentucky Supreme Court rejected all of these claims on direct appeal because Johnson "failed to cite any proof indicating that these matters were brought to the attention of the trial court" or that they were "objected to at trial." *Johnson*, 892 S.W.2d at 562. The Kentucky appellate courts have long refused to review claims of error that were not preserved below. *See, e.g.*, *Turner v. Commonwealth*, 460 S.W.2d 345, 346 (Ky. 1970); *McDonald v. Commonwealth*, 554 S.W.2d 84, 86 (Ky. 1977). Accordingly, this rule constitutes an adequate and independent state procedural ground, and it prevents this Court from reviewing these claims. *See Sochor v. Florida*, 504 U.S. 527, 534 (1992) (finding procedural default where state supreme court refused to adjudicate claim because petitioner had not preserved it for appeal). Johnson has not argued that this procedural default should be excused because of cause and prejudice. Accordingly, these claims fail.

Similarly, in Claim 7(A), Johnson argues that the trial court abused its discretion by denying his motion for a change of venue. Memo at 143. Believing that, because the Sizemore family was so well-connected, he could not get a fair and impartial jury in Leslie County, Johnson filed a pretrial motion for a change of venue. The trial court denied the motion after a hearing, but stated that Johnson could renew the motion during jury selection if it became clear

that an impartial jury could not be seated. Johnson did not renew the motion. Johnson raised the trial court's denial of his change-of-venue motion as an error on direct appeal, but the Kentucky Supreme Court held that Johnson's failure to renew the motion "waived any objection as to venue," and therefore refused to consider the claim. *Johnson*, 892 S.W.2d at 562. This also constitutes a procedural default. *See Sochor*, 504 U.S. at 534.

To avoid this default, Johnson argues that his trial counsel were ineffective for failing to renew the motion for change of venue. Memo at 149. Johnson advances this argument both as a means of avoiding procedural default by demonstrating cause and prejudice and as a stand-alone claim (Claim 7(B)). It fails in both respects. It is true that "[i]neffective assistance of [] counsel can constitute cause to excuse a procedural default." *Landrum v. Mitchell*, 625 F.3d 905, 916 (6th Cir. 2010) (citing *Murray v. Carrier*, 477 U.S. 478, 492 (1986)). If a defendant procedurally defaults because his trial counsel deficiently failed to make an objection, the trial counsel's ineffectiveness can constitute "cause" for the default and allow a federal habeas court to review the claim. But, like any other habeas claim, the petitioner must fairly present the ineffective-assistance claim to the state courts and give them an opportunity to rule on it. *Carrier*, 477 U.S. at 489. If the petitioner has not done so, the ineffective-assistance claim itself has been procedurally defaulted, and it cannot constitute cause to excuse procedural default of another claim. *See Edwards v. Carpenter*, 529 U.S. 446, 453 (2000) (holding "that an ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted"). If the petitioner has presented the ineffective-assistance claim to the state courts and the state courts have rejected it on the merits, the habeas

court must review that determination using AEDPA's deferential standard.  *See Orbe v. True*, 233 F. Supp. 2d 749, 757-60 (E.D. Va. 2002).

Here, Johnson argued on collateral review that his trial counsel were ineffective for failing to renew his change-of-venue motion.  The Kentucky Court of Appeals rejected that claim on the merits.  The court noted that "the trial court had already denied a previous motion for a change of venue and gave leave to renew the motion if a jury could not be empaneled.  Twelve jurors and two alternates were seated."  R. 24-47 at 5.  The court therefore could not "perceive how Johnson was prejudiced.  A jury was properly empaneled without the taint of pretrial publicity.  Therefore, the trial court would have again denied the motion even if it had been renewed."  *Id.* at 5-6.  The Kentucky Court of Appeals thus held, on the merits, that Johnson's lawyer was not ineffective for failing to renew the change-of-venue motion because there were simply no non-frivolous grounds on which to renew it; and further, even if his lawyer had renewed the motion, the trial court simply would have denied it.  As such, Johnson did not suffer any prejudice.  That holding is not contrary to or an unreasonable application of clearly established federal law.  Trial counsel do not perform deficiently simply by "failing to take frivolous action."  *United States v. Carter*, 355 F.3d 920, 924 (6th Cir. 2004).  And, as a matter of common sense, "failing to make a motion with no chance of success could not possibly prejudice the outcome."  *Id.*  Because an impartial jury was ultimately seated, Johnson's motion for a change of venue simply would have been denied if his counsel had renewed it.  Therefore, failing to renew the motion was not ineffective assistance of counsel.  Accordingly, this ineffective-assistance claim fails, both as cause for Johnson procedurally defaulting his claim

that the trial court erred by denying his motion for change of venue (Claim 7(A)), and as a claim on its own (Claim 7(B)).

Lastly, Johnson procedurally defaulted part of Claim 15. There, Johnson faults the trial court's decision to hold an *in camera* conference at which he was not present. At this conference, the judge, the prosecutor, and Johnson's attorneys discussed Juror Rex Boggs's objections to continuing to serve on the jury. Tr. 506-29. Johnson argues that his exclusion from the hearing violated his due process rights and that his counsel's failure to insist on Johnson's presence constituted ineffective assistance. Johnson never presented the due process component of this claim to the state courts on direct review, even though he could have. Accordingly, that part of the claim is procedurally defaulted. *See Williams*, 460 F.3d at 806. Johnson did present the ineffective-assistance component of this claim to the state courts in his Rule 11.42 petition. The Kentucky Court of Appeals rejected it, refusing to consider the claim's merits because "[t]he issue of Johnson's absence at the hearing could have been raised upon direct appeal and the issue relating to juror misconduct was decided on direct appeal." R. 24-47 at 10. As discussed previously, Johnson unsuccessfully challenged the trial court's decision to keep Boggs on the jury on direct appeal. In Kentucky, "[a]n issue raised and rejected on direct appeal may not be reconsidered in [Rule 11.42] proceedings by simply claiming that it amounts to ineffective assistance of counsel." *Hodge v. Commonwealth*, 116 S.W.3d 463, 468 (Ky. 2003); *see also Sanders v. Commonwealth*, 89 S.W.3d 380, 385 (Ky. 2002); *Haight v. Commonwealth*, 41 S.W.3d 436, 441 (Ky. 2001). Accordingly, because the Kentucky courts rejected Johnson's direct-appeal claim that the trial court erred by keeping Boggs on the jury,

Johnson was precluded from simply repackaging this argument as a claim that his counsel were ineffective for not making sure that Johnson was present at the hearing where the issue of keeping Boggs on the jury was discussed. Therefore, review of this claim is barred by procedural default.

## III.    Claims that the Court Reviews on the Merits

The remainder of Johnson's claims cleared the first two hurdles—Johnson exhausted these claims by fairly presenting them to the state courts in conformity with state procedural rules. Thus, the Court reviews these claims on the merits. But the standard of review that the Court must employ varies depending on how the state courts handled the claims. The state appellate courts adjudicated, and rejected, most of the remaining claims on the merits. The Court must evaluate these claims using AEDPA's deferential standard of review. For four of the remaining claims, the Kentucky Court of Appeals refused to consider the merits because it erroneously applied a procedural bar. The state trial court, however, adjudicated these claims on the merits; the Court therefore reviews the trial court's decision through AEDPA's deferential lens. Finally, for one of Johnson's claims, both the state trial and appellate courts refused to consider the merits because they erroneously applied a procedural bar. For this lone claim, *de novo* review is appropriate.

### 1.    Claims the Kentucky Courts Adjudicated on the Merits

For the claims that the Kentucky courts adjudicated, and rejected, on the merits, Johnson faces an especially imposing impediment in his path to habeas relief. AEDPA erects a substantial fortification around these state court decisions. A federal habeas court may only

brush them aside and grant habeas relief if the state courts' decisions are "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or if they were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). This standard is "difficult to meet," and purposefully so. *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). Although AEDPA "stops short of imposing a complete bar" on federal habeas corpus, it "preserves authority to issue the writ [only] in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Id.* Thus, under AEDPA, "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id*. (quoting *Jackson v. Virginia*. 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment)). Stated simply, as long as a "fairminded jurist[]" could agree with the state court's result, habeas relief is precluded. *Id*.

### A.    Direct Appeal Claims

Two of Johnson's claims relating to the destruction of physical evidence were rejected by the Kentucky Supreme Court on direct appeal. First, in Claim 5(D), Johnson claims that the prosecutors' "intentional destruction of physical evidence precluded a fair trial . . . and violated [his] right to due process of law." Memo at 76. Johnson cries foul because the state did not preserve several pieces of physical evidence, including Brian Sizemore's truck. After the shooting, detectives extensively photographed the truck and other pieces of physical evidence at the scene, including a table and a wooden post that had bullets lodged in them. *Johnson*, 892

S.W.2d at 560. Officers returned the truck to the victim's family two days after the shooting, and the family had the truck repaired and repainted. *Id.* Johnson was not arrested for the murder until more than three months later. *Id.*

The Kentucky Supreme Court rejected this claim on direct appeal, finding it to be "completely without merit" because "there was absolutely no showing of any bad faith" in the officers' handling of the physical evidence. *Id*. at 561. The Court noted that the State provided Johnson with "numerous photographs of all the physical evidence, including the victim's truck and the post and table where bullet fragments had lodged." *Id.* This decision was not "contrary to," nor did it "involve[] an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d). The truck, the table, and the wooden post were not material exculpatory evidence. Rather, they were "evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *Arizona v. Youngblood*, 488 U.S. 51, 57 (1988). The Supreme Court has held that a defendant must show that the failure to preserve such evidence was the result of "bad faith" in order to prevail on a due process claim. *Id.* at 58. Bad faith, in turn, requires demonstrating that law enforcement engaged in "a conscious effort to suppress exculpatory evidence." *California v. Trombetta*, 467 U.S. 479, 488 (1984). Neither negligence, nor even gross negligence, is enough. *See United States v. Wright*, 260 F.3d 568, 571 (6th Cir. 2001).

The Kentucky Supreme Court concluded that Johnson had made "absolutely no showing of any bad faith," *Johnson*, 892 S.W.2d at 561, and Johnson has raised nothing in his habeas petition demonstrating that this conclusion was unreasonable. Indeed, how could the officers

have acted out of bad faith in returning the truck to the Sizemores when Johnson was not even arrested for the crime until more than three months later? "The presence or absence of bad faith . . . must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood*, 488 U.S. at 56 n.*. The officers allegedly "destroyed" the evidence months before Johnson was even arrested for the murder, and hence long before they knew any of the theories that he would advance at trial. *See Monzo v. Edwards*, 281 F.3d 568, 580 (6th Cir. 2002) (no bad faith where law enforcement mistakenly destroyed "rape kit" evidence before the defendant had even been fingered as a suspect). Further, officers and crime-scene investigators took numerous photographs of the truck and the other relevant physical evidence and provided these photographs to the defense. *Johnson*, 892 S.W.2d at 561. It is quite common for officers to return evidence to normal use after it has been sufficiently photographed and tested. If a murder occurs on a city street, police do not cordon the street off until the murderer is caught and convicted. If they did, many cities would be virtually impassable. Instead, investigators photograph the crime scene and then return the street to normal use. Here, after the murder, Johnson was on the lam for more than three months. The Sizemores presumably needed their truck back. Given these facts and the realities of police work, the Kentucky Supreme Court's determination that there was no bad faith—and, hence, no due process violation—in the failure to preserve the evidence was reasonable. Indeed, the three dissenting justices on the Kentucky Supreme Court said that, at most, officers were merely "negligent" in failing to preserve evidence. *Id.* at 563 (Stumbo, J., dissenting). That is not

enough to establish a violation of due process. *See Wright*, 260 F.3d at 571. This claim therefore fails.

Relatedly, in Claim 6, Johnson argues that the "jury instruction given by the trial court on missing evidence was insufficient to protect [his] right to due process and to a fair trial." Memo at 132. Because the missing evidence itself was not a due process violation, the jury instruction concerning that evidence, *ipso facto*, was not a due process violation either. *See United States v. Boxley*, 373 F.3d 759, 762-63 (6th Cir. 2004) (trial court's refusal to give missing-evidence instruction was not error where defendant failed to prove that police officers acted in bad faith in failing to preserve evidence); *Collins v. Commonwealth*, 951 S.W.2d 569, 573 (Ky. 1997) (where police had not destroyed evidence in bad faith, giving missing evidence instruction provided defendant "more than the process due"). Here, by giving Johnson a missing evidence instruction even when it was not required to do so, the trial court, as the Kentucky Supreme Court recognized, "'bent over backwards' to be fair . . . with regard to the physical evidence issue." *Johnson*, 892 S.W.2d at 561. The Kentucky Supreme Court's rejection of Johnson's due process claim relating to the missing evidence instruction wast herefore reasonable. Accordingly, this claim also fails.

### B.    Ineffective-Assistance Collateral Claims

Johnson devotes the bulk of his habeas petition to a barrage of claims under the Sixth Amendment. Complaining about his lawyer's performance after the fact is "a favorite tactic of an unsuccessful criminal defendant," *Ford v. Israel*, 701 F.2d 689, 692 (7th Cir. 1983), and Johnson is no exception. He lobs tomatoes at his trial counsel's performance from four different

angles. He faults his counsel for (1) failing to object to certain instances of prosecutorial misconduct, (2) failing to call certain witnesses, (3) failing to adequately cross-examine some of the state's witnesses, and (4) failing to introduce or appropriately emphasize certain pieces of evidence.

Johnson faces a particularly steep climb to prevail on these claims. The Supreme Court has in recent terms emphasized with renewed vigor the deferential review that a federal habeas court must apply to ineffective-assistance claims. *See, e.g.*, *Richter*, 131 S. Ct. at 788 ("[T]he *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve.") (quoting *Strickland v. Washington*, 466 U.S. 668, 689-90 (1984)). To prevail, not only must Johnson show, in the face of a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," that his counsel's performance was deficient. *Strickland*, 466 U.S. at 687, 689. And not only must he show that, but for his counsel's deficient performance, there is a reasonable probability that the outcome of the trial would have been different. *Id.* at 694. AEDPA also requires him to demonstrate that, in rejecting his claims, the state courts "applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Bell v. Cone*, 535 U.S. 685, 699 (2002). In other words, Johnson must demonstrate that his counsel's performance was *so* deficient and the prejudice that resulted from it *so* obvious that no "fairminded jurist" could agree with the state courts' determination that *Strickland* was not satisfied. *See Richter*, 131 S. Ct. at 786. Because a federal habeas court reviews counsel's performance through two overlapping prisms—*Strickland* and AEDPA—each of which contains

a wide degree of deference, the Supreme Court has recently said that such review is "doubly deferential." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011) (quoting *Knowles v. Mirzayance*, 129 S. Ct. 1411, 1413 (2009)); *see also Bray v. Andrews*, --- F.3d ---, No. 09-4151, 2011 WL 1544740, *5 (6th Cir. April 26, 2011). None of Johnson's ineffective-assistance claims satisfy this high standard.

### 1. Failure to Object to Prosecutorial Misconduct

Johnson first attacks his counsel's failure to object to certain instances of prosecutorial misconduct. In Claim 5(F)(ii), Johnson argues that his counsel were ineffective because they did not object to several allegedly inappropriate questions that the prosecutors asked on cross-examination, including whether Johnson had kicked-in the dashboard of his brother's truck after he realized that he had killed the wrong person. Johnson argues that the prosecutors asked this and other prejudicial questions without adequate foundation, and therefore that his counsel's failure to object constituted deficient performance. In Claim 5(G), Johnson argues that his trial counsel were ineffective because they did not object to certain statements that the prosecutors made during opening and closing arguments.[1]

The Kentucky Court of Appeals rejected both claims on collateral review. With respect to the prosecutors' questions on cross-examination, the court held that, "[i]n light of the totality of the evidence . . . [it could not] conclude that counsel was ineffective for failing to object to the allegedly improper question." R. 24-47 at 6-7. The court also rejected Johnson's claim

---

[1] Part of this claim is procedurally defaulted. In the state courts, Johnson only presented this claim with respect to statements made during *closing* arguments, not opening statements. Therefore, the part of this claim dealing with opening statements is procedurally defaulted.

regarding his counsels' failure to object to certain statements that the prosecutors made during closing arguments, holding that its "review of the record indicates that the comments were not sufficiently flagrant as to prejudice Johnson or to deprive him of due process." R. 24-47 at 7.

Neither of these conclusions is objectively unreasonable. The threshold for establishing deficient performance based on trial counsel's failure to object during trial is quite high indeed. As the Sixth Circuit has explained, "experienced trial counsel learn that objections to each potentially objectionable event could actually act to their [client's] detriment." *Lundgren v. Mitchell*, 440 F.3d 754, 774 (6th Cir. 2006). Defense counsel does himself no favors with the jury by objecting like a broken record to every conceivable error. Experienced counsel therefore "use objections in a tactical manner," letting some errors slide and saving objections for the errors that really matter. *Id*. In light of this reality, "any single failure to object" is not error unless the prosecutor's question "is so prejudicial to a client that failure to object essentially defaults the case to the state." *Id*. The question that Johnson complains of—whether he kicked-in the dashboard of his brother's truck when he learned that he had killed the wrong person—does not rise to this level. It was but one question out of many that the prosecutor asked Johnson during a lengthy, and oftentimes quite hostile, cross-examination. It was not unreasonable for the Kentucky state court to conclude that defense counsel's failure to object to this single question was not deficient performance because it did not effectively "default the case to the state." *Id*.

But even if failing to object was deficient, the Kentucky Court of Appeals' determination that there was no prejudice in light of "the totality of the evidence," R. 24-47 at 6, was surely

reasonable. Johnson has not demonstrated that the trial court likely would have sustained the objections. *See Ross v. United States*, 339 F.3d 483, 495 (6th Cir. 2003) (defense counsel's failure to object to certain questions asked by the prosecutor caused no prejudice where it "seem[ed] probable that the court would have overruled any objection"). But even assuming the objections would have been sustained, the evidence of guilt against Johnson was substantial. Johnson arrived at George Sizemore's house with a temper and a pistol. He clearly was prepared to shoot somebody, and he left only after the pistol had been taken away from him during an altercation. The shooting occurred just a few minutes later. Several eyewitnesses either directly identified Johnson as the shooter or saw Johnson's red two-tone Chevy pickup truck drive by as the shooting occurred. Shell casings found at the scene matched the very type of rifle that a witness had seen in Johnson's truck earlier that day, Johnson lied to nurses at the hospital about how he was injured, and then he mysteriously vanished for three months after the shooting. "In light of this overwhelming evidence, it is difficult to conclude that there exists a reasonable probability that" if defense counsel had objected to these few questions "the result of [] the guilt phase [] would have been different." *Lundgren*, 440 F.3d at 775.

The Kentucky appellate court also was not unreasonable to brush aside Johnson's claim regarding closing arguments. In his habeas petition, Johnson dissects the prosecutor's closing arguments and lodges a number of complaints. He argues that the prosecutor misrepresented certain facts, injected his personal beliefs, commented on the credibility of certain witnesses, and offered a personal opinion as to Johnson's guilt, among other sins. Memo at 114-31. Federal courts generally "afford wide latitude to a prosecutor during closing argument," *United States*

*v. Henry*, 545 F.3d 367, 377 (6th Cir. 2008), and review "the government's comments during closing arguments . . . 'deferentially on habeas review.'" *Robinson v. Davis*, No. 09-1248, 2011 WL 678428, at *6 (6th Cir. Feb. 25, 2011) (quoting *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004)).  In light of this deferential standard, it was not objectively unreasonable for the Kentucky courts to conclude that the prosecutors' statements were not sufficiently flagrant to prejudice Johnson.  Again, there are numerous reasons that might have led defense counsel not to lodge objections, including not wanting to raise the jury's ire and avoiding drawing attention to a particular statement.  *See Schauer v. McKee*, 401 F. App'x 97, 101 (6th Cir. 2010).  But even assuming that not objecting was deficient, the state court's conclusion that Johnson suffered no prejudice was also reasonable.  As recounted above, the evidence against Johnson was substantial.  Even if Johnson's trial counsel had objected to each of the statements Johnson complains about and the trial court sustained each objection, there is no reasonable probability that the outcome of the trial would have been different.  After all, it is unlikely that the jury was teetering on the edge of finding Johnson guilty or acquitting him—the jury returned a guilty verdict in only *twelve minutes*.  A few successful objections during the state's closing argument probably would not have changed the result, and at any rate, it was not objectively unreasonable for the state courts to so conclude.  Therefore, because a "fairminded jurist" could agree with the state courts' rejection of these ineffective-assistance claims, they both fail.  *See Richter*, 131 S. Ct. at 786.

## 2.    Failure to call witnesses

Johnson next argues that his trial counsel were ineffective for failing to call two different witnesses.  First, in Claim 9, Johnson faults his attorneys for not calling ten-year-old Derrell Bowling as an alibi witness.  During the trial, Derrell's mother, Alice Bowling, testified that on the night of the murder she saw Johnson's truck pull out of the Sizemores' driveway and drive off, away from the scene of the shooting.  Derrell was also in the car that night.  Johnson claims that his trial counsel were ineffective because they did not call Derrell as a witness to bolster the credibility of his mother's testimony.  Second, in Claim 13, Johnson argues that his trial counsel were ineffective for not calling a private investigator, Bill Phillips, as a witness.  Memo at 213. Johnson's legal team hired Phillips to investigate the murder prior to trial.  Johnson claims that Phillips would have provided helpful testimony—he would have said that he spoke with Michael Turner, one of the state's key eyewitnesses, who told him that he had not actually seen Johnson commit the murder, and he would have testified about a test of the lighting conditions that he conducted at the scene of the murder.  Memo at 214-16.

Johnson raised both claims in his Rule 11.42 petition, and the Kentucky courts rejected them.  As to the claim regarding Derrell Bowling, the trial court held that Johnson's counsel was not "ineffective in not putting on a ten year old who might contradict what [Ms. Bowling] already said." R. 24-39 at 6.  The court also noted that, at most, Derrell's testimony would have been "cumulative." *Id.*  The Kentucky Court of Appeals reached the same conclusion, holding that Derrell's testimony "would have been cumulative at best and the decision not to call him was clearly a tactical decision." R. 24-37 at 7.  The state courts' decisions easily withstand

AEDPA's deferential review. The determination that Derrell's testimony would have been cumulative at best was not "an unreasonable determination of the facts in light of the evidence." 28 U.S.C. § 2254(d)(2). Ms. Bowling testified that she had seen Johnson's truck drive away from the murder scene, and that is the same thing that Derrell presumably would have said. A fairminded jurist could conclude that not calling a ten-year-old witness who, at best, would have provided cumulative testimony and who, at worst, might have contradicted what his mother had already said, was a perfectly reasonable tactical decision. *See Grant v. Ricks*, 151 F. App'x 44, 45 (2d Cir. 2005) (trial counsel's decision not to call witness who would have provided cumulative testimony was tactical and thus did not constitute deficient performance); *Horton v. Allen*, 370 F.3d 75, 86 (1st Cir. 2004) ("The decision whether to call a particular witness is almost always strategic, requiring a balancing of the benefits and risks of the anticipated testimony.") (quoting *Lema v. United States*, 987 F.2d 48, 54 (1st Cir. 1993)); *United States v. Luciano*, 158 F.3d 655, 660 (2d Cir. 1998) (because "[t]he decision not to call a particular witness is typically a question of trial strategy," counsel did not render ineffective assistance by failing to call witness whose testimony "might well have been regarded [] as unnecessarily cumulative"). Accordingly, the state courts' holding that Johnson's counsel were not ineffective for failing to call Derrell as a witness was reasonable. This claim must fail.

The Kentucky courts also rejected Johnson's claim as to his counsel's failure to call private investigator Bill Phillips as a witness. The Kentucky Court of Appeals held that its "review of the record demonstrates that the decision not to call the investigator as a witness was a sound tactical decision . . . because the potential testimony of the investigator would not have

altered the outcome of the trial." R. 24-47 at 9. In other words, the court held that this claim failed both *Strickland* prongs—the decision not to call Phillips was not deficient performance, and even if Phillips had been called, his testimony would not have altered the outcome of the trial. This conclusion also easily survives AEDPA review. At most, Phillips might have cast some doubt on one of the state's witnesses, and might have told the jury about his tests of the lighting conditions at the murder scene. But it is quite a stretch to conclude that Phillips's testimony would have tipped the balance of the case in Johnson's favor. The jury likely would have been skeptical of Phillips's testimony. After all, he was employed by Johnson's defense team, and had no particular expertise in lighting conditions. Even worse, Phillips had previously been convicted of felony jury tampering, which almost certainly would have come out on cross-examination. Memo at 214. Accordingly, the Kentucky courts' decision that not calling Phillips was a reasonable tactical decision, and, at any rate, that calling him would not have changed the outcome of the trial, was reasonable. Indeed, even Johnson himself implicitly concedes that calling Phillips would not have changed the outcome of the trial. The most Johnson argues is that "there is a reasonable probability that [Phillips's] testimony would have *aided* [his] defense." Memo at 219 (emphasis added). Johnson's own argument does not even rise to *Strickland*'s required level—a reasonable probability that calling Phillips would have *changed the outcome of the trial*. Accordingly, this claim also fails. *See Clark v. Waller*, 490 F.3d 551, 558 (6th Cir. 2007) (rejecting ineffective assistance claim where habeas petitioner only argued that missing witness's testimony "'would have aided his defense'—a claim considerably weaker than a demonstration of a likelihood of a different outcome at trial").

### 3.    Failure to Adequately Cross-Examine Witnesses

In Claim 11, Johnson claims that his trial counsel were ineffective because they did not adequately cross-examine certain prosecution witnesses. Memo at 199. Johnson argues that, had his trial counsel pushed back harder against some of the witnesses' statements, they "would have proven that some of those witnesses had perjured themselves and that other witnesses' recollection of events was dubious." Memo at 204-05. Johnson presented this claim in his Rule 11.42 petition. The Kentucky Court of Appeals rejected it out of hand. The court "reviewed the cross-examinations and testimony at issue and [found] no merit in Johnson's contention because the complained of cross-examinations produced testimony that was either favorable to him or called into question evidence for the Commonwealth." R. 24-47 at 8. Therefore, the court concluded, "[c]ounsel's performance was not deficient." *Id.*

The state courts' holding was reasonable. It is not this Court's role to re-examine or "second-guess counsel's assistance" with a fine-toothed comb. *Strickland*, 466 U.S. at 689. "[E]xperienced trial attorneys may choose not to cross-examine witnesses," or to cross-examine them only on limited subjects, for any number of valid reasons. *Tevlin v. Spencer*, 621 F.3d 59, 69 (1st Cir. 2010); *see also Eze v. Senkowski*, 321 F.3d 110, 132 (2d Cir. 2003) (recognizing "the significant deference [courts] accord a trial counsel's decision how to conduct cross-examination and [courts'] refusal to use perfect hindsight to criticize unsuccessful trial strategies"). Although Johnson catalogues several inconsistencies in some witnesses' testimony that he believes his lawyer should have probed more forcefully, Memo at 199-205, he has pointed to no instance that, in light of the "significant deference" that courts accord attorneys' conduct of cross-

examination, *Eze*, 321 F.3d at 132, clearly constituted professional error. Nor has he established prejudice—i.e. a "reasonable probability that more vigorous examination" would have changed the result of the trial. *Tevlin*, 621 F.3d at 69. Johnson's argument is entirely speculative—*if* his lawyers had asked the "right" questions, then the state's witnesses *might* have revealed that they had perjured themselves, or they *might* have revealed that their recollection of events was dubious, and this *might* have led the jury to either acquit Johnson or give him a lesser sentence. This chain of reasoning involves a few too many "ifs" and "mights" to satisfy *Strickland*'s prejudice requirement—"a *reasonable probability* that . . . the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694 (emphasis added). Accordingly, the state courts' decision that Johnson failed to establish prejudice is reasonable, and this claim therefore fails.

### 4. Failure to Introduce or Appropriately Emphasize Evidence

Lastly, Johnson faults his counsel for not introducing certain pieces of evidence. First, in Claim 10, Johnson claims that his trial counsel were ineffective because they did not introduce a police report that could have impeached several of the prosecution's witnesses. Petition at 61. When the police detective arrived on the scene to investigate the shooting, he wrote in his report that the weather was "cloudy" and "rainy" and that the lighting conditions were "poor." The report was taken almost two hours after the shooting. Johnson argues that his lawyer should have used this report to impeach several of the prosecution's witnesses, who purportedly identified Johnson as the shooter from more than 75 feet away. The Kentucky Court of Appeals rejected this claim on collateral review, holding that "[t]he decision not to introduce the report

was a strategic tactic that will not be second-guessed by hindsight." R. 24-47 at 7-8. The court noted that the report "was taken approximately an hour and a half after the time the other witnesses described" and "[t]he report also contained other information that could have been used to impeach the defense's own witnesses." *Id*.

This determination was not unreasonable. *Strickland* directs courts to review counsel's performance though a "highly deferential" lens and to "indulge a strong presumption that counsel's conduct . . . might be considered sound trial strategy." 466 U.S. at 689. Here, as the state courts noted, the police report was written more than an hour and a half after the murder—weather conditions could have changed. And there were good reasons not to try to introduce the report. First, parts of the report likely would have been inadmissible as hearsay under the Kentucky Rules of Evidence. *See Manning v. Commonwealth*, 23 S.W.3d 610, 613-14 (Ky. 2000). Second, and more importantly, introducing the report could have undermined one of the defense's key alibi witness—Alice Bowling. She testified that she saw Johnson's truck pull out of the Sizemores' driveway and that she followed it a good distance away from the Sizemores' house. She identified the truck as belonging to Johnson based on its color and a bumper sticker. A reasonable attorney could have concluded that introducing the police report would have given the prosecution additional ammo to attack Bowling's testimony (Question: "The police report from the night of the murder says that it was 'cloudy' and 'rainy,' and that the lighting was "poor." How can you be certain that the bumper sticker on the truck you saw matched the bumper sticker on Johnson's truck?"). Thus, there were both potential risks and potential rewards from introducing the police report. Even if it would be a close question under

a *de novo* standard whether the decision not to introduce the police report "fell below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, it is not a close question whether the state courts' rejection of the claim was "contrary to" or an "unreasonable application of" *Strickland*. It clearly was not. A fairminded jurist could agree with the state courts' result. Accordingly, this claim fails.

Next, in Claim 12, Johnson argues that his trial counsel were ineffective because they adopted a strategy of "downplaying" injuries, including a gash over his eye, that Johnson received during a scuffle with members of the Sizemore family immediately before the murder. Memo at 206. Johnson believes that, had his attorneys laid more emphasis on his injuries, including by introducing a photograph of Johnson's face taken shortly after the fight, the jury might have acquitted him on self-defense grounds or convicted him of a lesser charge. Johnson asserted this claim in his Rule 11.42 petition, and the Kentucky Court of Appeals rejected it. R. 24-47 at 8. The court determined that downplaying Johnson's injuries "was clearly a tactical decision" because "[p]resenting the photographs [of his injuries] would have tended to contradict Johnson's defense of alibi and complete denial. In fact, such photographs would have tended to provide evidence of motive." *Id.* at 8-9. The court therefore refused to "second-guess[] by hindsight" counsel's decision not to introduce the photographs. This determination was not "contrary to" or an "unreasonable application of" clearly established federal law. At trial, Johnson's lawyers adopted the strategy of denying that Johnson committed the murder entirely. Introducing evidence of the injuries that Johnson received in a fight just minutes before the murder—i.e. a perfect motive—would have been directly contrary to that strategy. Indeed, if

Johnson's trial counsel had introduced the photograph of his injuries and the jury had still convicted him of first-degree murder, Johnson very well might have argued that the decision to introduce the photograph constituted ineffective assistance because it crystallized Johnson's likely motive for the jury. Choosing whether to introduce evidence that has potential risks and rewards is at the very core of a trial counsel's tactical discretion—a discretion that courts should only rarely second-guess. *See Collier v. Lafler*, No. 09-1477, 2011 WL 1211465, *5 (6th Cir. March 30, 2011) (no ineffective assistance where trial counsel had to weigh the "benefit" of a witness's statement to the defendant against the "risk" of the witness providing a "potentially inculpatory eyewitness account"); *Lema v. United States*, 987 F.2d 48, 55 (1st Cir. 1993) (no ineffective assistance where litigation conduct had "obvious tactical risks and limited benefits"). There are absolutely no grounds for disturbing the state courts' conclusion that the failure to introduce photographs of the injuries did not constitute deficient performance. This claim fails.

Finally, in Claim 14, Johnson argues that his trial counsel were ineffective because, during the penalty phase of the trial, they did not present certain mitigating evidence to the jury. Johnson faults his trial counsel for failing to call members of his family as witnesses to "humanize" him and for failing to present the photographs of the injuries Johnson received during the fight with Bobby Sizemore immediately before the murder. Memo at 220. Johnson presented this claim in his Rule 11.42 petition. The trial court rejected it, finding that, in order to have presented evidence of Johnson's injury as mitigation, defense counsel "would have had to change [Johnson's] story," R. 24-39 at 9—i.e. from "he didn't do it" to "he only did it because he had been assaulted." The trial court determined "that the same tactical reasoning of counsel

regarding [Johnson's] injuries in the guilt phase of the trial would apply to the sentencing phase as well," and therefore counsel's failure to present evidence of Johnson's injuries did "not constitute ineffective assistance of counsel." *Id.* The Kentucky Court of Appeals affirmed. The court held that not presenting evidence of Johnson's injuries "was tactical in that it would have required counsel to contradict its own theory of the case." R. 24-47 at 10. The court also rejected Johnson's claim that his counsel were ineffective for failing to introduce testimony of his family members because the claim was far too generalized—Johnson "pointed [the court] to no evidence in the record to support [his] allegation that mitigation evidence was available and what that evidence might have been." *Id.* at 10-11.

The state courts' decisions survive AEDPA review. Quite simply, the decisions cannot be "contrary to, or involve an unreasonable application of, clearly established Federal law, *as determined by the Supreme Court of the United States*," 28 U.S.C. § 2254(d)(1) (emphasis added), because the Supreme Court has never enunciated the standard that applies to ineffective-assistance-of-counsel claims during the sentencing phase of non-capital cases. *See Davis v. Grigas*, 443 F.3d 1155, 1158 (9th Cir. 2006) ("[S]ince *Strickland*, the Supreme Court has not delineated a standard which should apply to ineffective assistance of counsel claims in noncapital sentencing cases. Therefore . . . there is no clearly established federal law as determined by the Supreme Court in this context."). The Supreme Court has enunciated the standards that apply to ineffective-assistance claims regarding the investigation into and presentation of evidence during the mitigation stage of death-penalty cases, *see Cullen v. Pinholster*, 131 S. Ct. 1388 (2011); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Wiggins v. Smith*,

-40-

539 U.S. 510 (2003); *Williams v. Taylor*, 529 U.S. 362 (2000), but the Court has never decided a case enunciating the standards that apply during non-capital sentencing. Therefore, because there is no "clearly established law, as determined by the Supreme Court of the United States" in this area, the Kentucky courts' decision could not possibly be "contrary to" or "involve an unreasonable application of" it. 28 U.S.C. § 2254(d)(1).

But even assuming that the same standards that apply to sentencing in capital cases also apply to sentencing in non-capital cases, the state courts' decisions are still not unreasonable. To justify habeas relief based on ineffective assistance during the sentencing phase of a capital case, a petitioner must "show that there is a reasonable probability that, but for his counsel's deficient performance, the result of the penalty phase would have been different." *Frazier v. Huffman*, 343 F.3d 780, 797 (6th Cir. 2003). Because habeas review "is limited to the record that was before the state court," *Cullen*, 131 S. Ct. at 1398, the petitioner must "have developed the factual bases for his claim during postconviction proceedings in state court," and he must direct the court "to mitigating evidence that could have been presented and that is sufficient to undermine [] confidence in the outcome of the penalty phase." *Frazier*, 343 F.3d at 797. Johnson has failed to carry this burden.

As to the photographs of his injuries, the state courts reasonably concluded that a competent lawyer could decide not to introduce them because doing so would look like an about-face to the jury. Or a lawyer could conclude that the photos would only inflame the jury more—conveying the impression that Johnson reacted to relatively minor injuries by gunning-down a nineteen-year-old boy. Accordingly, not introducing the photos was a tactical decision and thus did not constitute ineffective assistance.

-41-

As to his family members, Johnson concedes in his habeas petition that he "did not specifically state what his family could have testified to" in his state post-conviction proceedings. Memo at 227. Johnson did not tell the state courts which family members would have testified on his behalf or what they would have said. This failure is fatal to his habeas claim. In essence, Johnson asks the Court to grant him a writ of habeas corpus—a truly extraordinary remedy—based on pure speculation about what members of his family might have said. That is completely anathema to a habeas court's limited role. *See Holladay v. Haley*, 209 F.3d 1243, 1252 (11th Cir. 2000) (rejecting ineffective assistance claim based on counsel's failure to present testimony of family members during penalty phase because petitioner did "not offer[] any evidence of the substance of the testimony which [] family members would have provided"); *Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001). In the cases where the Supreme Court has found prejudice based on counsel's failure to investigate or present possible mitigation evidence, the evidence was much more concrete and powerful. *See, e.g.*, *Wiggins*, 539 U.S. at 534-35 (finding prejudice where counsel failed to discover and present during mitigation stage evidence that defendant "suffered physical torment, sexual molestation, and repeated rape during his" childhood, that his mother was "absentee" and an "alcoholic," and that he had been homeless for several years). When held up alongside the kinds of concrete mitigation evidence that are required to demonstrate prejudice, Johnson's vague, unsupported assertions that testimony from his family members might have "humanized" him falls far short. *Cf. Cullen v. Pinholster*, 131 S. Ct. 1388, 1407-08 (2011) (criticizing "[t]he current infatuation with 'humanizing' the defendant as the be-all and end-all of mitigation" because it "disregards the possibility that this may be the wrong tactic in some cases because experienced lawyers

conclude that the jury simply won't buy it.") (quoting *Pinholster v. Ayers*, 590 F.3d 651, 692 (9th Cir. 2009) (en banc) (Kozinski, J., dissenting)).  Accepting Johnson's argument on this claim would give virtually all state habeas petitioners a get-out-of-jail-free card.  If all they have to do to receive a writ of habeas corpus is identify a few family members who could have, but did not, testify during their sentencing hearing, and rely on the habeas court to speculate about the helpful things the family members might have said, the habeas floodgates would open like never before.  That is not the law.  Johnson's claim that his counsel were ineffective during the sentencing phase of his trial therefore fails.

### 2. Claims the Kentucky Court of Appeals Erroneously Held were Procedurally Defaulted, but that the State Trial Court Adjudicated on the Merits

Although the Kentucky Court of Appeals denied most of Johnson's ineffective-assistance claims on the merits, it refused to reach some of them in reliance on a procedural bar.  In four cases, that was error.  However, the state trial court adjudicated three of these four claims on the merits.  For these three claims, this Court must "look[] through" to the state trial court's decision and determine whether it withstands AEDPA's deferential standard or review.  *See Sweet v. Sec'y, Dept. of Corr.*, 467 F.3d 1311, 1317 (11th Cir. 2006).  In all three cases, it does.

First, as part of Claim 4, Johnson argues that his trial counsel were ineffective because, during the trial court's hearing on his motion for a new trial, they did not call any witnesses to develop the claim regarding the failure of jurors Melton and Hayes to fully disclose their prior involvement with Johnson during voir dire.  Memo at 59-63.  Johnson raised this ineffective-assistance claim in his Rule 11.42 motion.  The Kentucky Court of Appeals rejected it on procedural grounds, holding that Johnson's claim that his "counsel was ineffective in its

handling of alleged juror misconduct issues" was "raised and decided by the Supreme Court on direct appeal and cannot now be relitigated on a motion pursuant to [Rule] 11.42." R. 24-47 at 7. That conclusion was simply incorrect. Johnson did *not* raise this ineffective-assistance claim on direct appeal. To the contrary, on direct appeal he argued that Melton and Hayes's failure to answer the voir dire questions truthfully entitled him to a new trial. That is the claim that the Kentucky Supreme Court rejected on direct appeal. But his ineffective-assistance claim is something else entirely. The Kentucky Supreme Court did *not* address that claim. Therefore, the Kentucky Court of Appeals' refusal to reach the claim on the basis of a purported procedural bar was erroneous. Accordingly, this Court is not precluded from evaluating the merits of the claim. *See Post v. Bradshaw*, 621 F.3d 406, 423 (6th Cir. 2010) ("[W]hen a state erroneously relies upon its own rule of procedural default, the claim is not barred."); *Durr v. Mitchell*, 487 F.3d 423, 434-35 (6th Cir. 2007) (finding no procedural default where state courts erroneously applied res judicata bar on collateral review after incorrectly concluding that petitioner had raised the claims on direct review).

Unfortunately for Johnson, this claim still fails on the merits. The Court must look to the last reasoned state-court decision addressing the merits of this claim—the trial court's decision. *See Sweet*, 467 F.3d at 1317. The Court can only grant habeas relief if that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or if the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The trial court's decision exhibits neither of these extreme defects.

The trial court held an evidentiary hearing on the claim during which Melton and Hayes both testified. Hayes testified that she had, in fact, been on a jury in a case involving Johnson in 1972. But she further said that she had "no recollection of" Johnson, and that she never "saw him or heard his name until [the 1993] trial." App'x G at 525-26. Melton—a schoolteacher—testified that, several years before the 1993 trial, she brought her class to the court to observe a trial that happened to involve Johnson as a defendant. *Id.* at 530. She said that she brought her class to observe a court proceeding "every year." *Id.* at 531. And she further testified that she did not know Johnson, although she was close friends with his sister, Vada. *Id.* at 533. Following the hearing, the trial court denied Johnson's ineffective-assistance claim. The court determined that neither Melton nor Hayes "made any false statement or left any misimpression in their responses to the voir dire questions." R. 24-39 at 3. The court therefore concluded that, even if Johnson's lawyers had called Melton and Hayes as witnesses during the motion for a new trial, they would not have uncovered anything justifying removing them from the jury or granting a new trial. Johnson has raised nothing to demonstrate that this was an "unreasonable determination of the facts." § 2254(d)(2). And, having concluded that nothing in their testimony would have justified dismissing Melton or Hayes from the jury or granting Johnson a new trial, the trial court correctly denied Johnson's ineffective-assistance claim because he had not demonstrated prejudice under *Strickland*'s second prong. Johnson could only have prevailed on his motion for a new trial by showing that either Melton or Hayes were biased against him—i.e., that their prior involvement with Johnson was such that "it is highly unlikely that the average person could remain impartial in his deliberations under the circumstances." *Treesh v. Bagley*, 612 F.3d 424, 437 (6th Cir. 2010) (internal citation and quotation marks

omitted).   Examples of such bias-inducing relationships are "that the juror is an actual employee

of the prosecuting agency, that the juror is a close relative of one of the participants in the trial

or the criminal transaction, or that the juror was a witness or somehow involved in the criminal

transaction."   *Id*. (quoting *Smith v. Phillips*, 455 U.S. 209, 222 (1982) (O'Connor, J.,

concurring)).   Neither Melton nor Hayes revealed anything that would have come close to

establishing bias under this high standard.   Therefore, even if his lawyer had called Melton and

Hayes as witnesses during the hearing on the new trial motion, the trial judge almost certainly

would still have denied his motion for a new trial.   In other words, there is no reasonable

probability that the result would have been different.   This claim therefore fails.

Similarly, in Claim 8, Johnson argues that his trial counsel were ineffective for failing

to object to the trial court's refusal to instruct the jury on lesser-included offenses, such as

manslaughter, or on self-defense or extreme emotional disturbance.   Memo at 157.   Johnson's

trial counsel submitted proposed jury instructions that included all of these instructions, App'x

K at 764-770, but the trial court ultimately instructed the jury only on intentional murder.   *Id.*

at 777.   Johnson's counsel did not object to these instructions.   Johnson raised this ineffective-

assistance claim in his Rule 11.42 petition.   The Kentucky Court of Appeals rejected it on the

basis of a procedural default.   Because Rule 11.42 petitions "cannot be used to relitigate issues

decided on direct appeal, or to raise issues that could have been presented on direct appeal," and

Johnson could have raised "[t]he issue of entitlement to additional jury instructions . . . on direct

appeal," the court refused to even consider the claim.   R. 24-47 (citing *Baze v. Commonwealth*,

23 S.W.3d 619, 626 (Ky. 2000)).

Here too, the Kentucky Court of Appeals' application of a procedural default was erroneous. Although Kentucky courts have said that "[a]n issue raised and rejected on direct appeal may not be reconsidered in [Rule 11.42] proceedings by simply claiming that it amounts to ineffective assistance of counsel," *Hodge v. Commonwealth*, 116 S.W.3d 463, 468 (Ky. 2003), Johnson did not raise the issue of the jury instructions on direct appeal. Resp. Br. at 65. The respondent has cited to no authority establishing that a defendant is precluded from raising in a Rule 11.42 petition an ineffective-assistance claim related to an issue that the defendant could have, but did not, raise on direct appeal. Indeed, one of the cases that the respondent cites, *Baze*, 23 S.W.3d at 625-26, establishes just the opposite. There, the defendant abandoned on direct appeal an objection to his case being transferred, but then asserted in his Rule 11.42 petition that his counsel had been ineffective for failing to object to the transfer. Although the *Baze* court acknowledged that "[i]t is not the purpose of [Rule] 11.42 to permit a convicted defendant to retry issues which could and should have been raised in the original proceedings," the court noted that it was "not the actual transfer of venue, but rather trial counsel's failure to object to the transfer that [was] at issue." *Id.* at 626. The court then analyzed, and rejected, the ineffective-assistance claim on the merits, concluding that any objection to the transfer would have been "invalid." *Id.* As in *Baze*, because Johnson did not object to the jury instructions on direct appeal, his ineffective-assistance claim regarding those objections was not procedurally defaulted.

But this conclusion does not save the claim for Johnson. The trial court actually analyzed the claim on the merits. Because the state appellate court erroneously applied a procedural default, this Court will "look[] through" to the state trial court's opinion. *See Sweet*, 467 F.3d

at 1317.  The trial court held that Johnson was not entitled to instructions on lesser-included offenses, self-defense, or extreme emotional disturbance because the evidence in the case "did not warrant [such instructions] as a matter of law and fact."  *Id.* at 2-3.  Because Johnson was not entitled to the instructions in the first place, the court held that his counsel was not ineffective for failing to adequately pursue them.  The court noted "the need for some degree of rapport with the jury and [to] obtain some degree of respect for them," and found that "as a practical matter adopting [Johnson's position on the jury instructions] would be at odds with this need."  *Id.* at 3.  This conclusion was not "an unreasonable determination of the facts," nor was it "contrary to" or "an unreasonable application of" clearly established federal law.  28 U.S.C. § 2254(d).  The state court held, based on the facts adduced at trial, that state law did not entitle Johnson to additional jury instructions.  This Court may not second guess the Kentucky court's interpretation of state law.  *See Greer v. Mitchell*, 264 F.3d 663, 675 (6th Cir. 2001).  Accordingly, because Johnson was not entitled to additional instructions, his counsel's failure to ask for them could not have been ineffective.  *See Commonwealth v. Davis*, 14 S.W.3d 9, 11 (Ky. 1999) ("[I]f the record does not support the conclusion that the objection [to the jury instructions] should have been sustained, then there can be no ineffective assistance of counsel for failing to object.").  And the record also plausibly supports the state court's conclusion that not asking for instructions on self-defense or extreme emotional disturbance was a reasonable tactical decision.  The defense's strategy was to deny guilt entirely; requesting these instructions would have undermined this approach.  This claim therefore fails.

Johnson also spins an ineffective-assistance-of-appellate-counsel claim out of the jury instructions issue.  He alleges that his appellate attorney was ineffective because he did not ask

the Kentucky Supreme Court to review the un-objected to jury instructions. Memo at 182. Johnson admits that he did not present this claim to any state court. Accordingly, for the reasons previously stated in Section II-A, *supra*, it is procedurally defaulted.

Lastly, as part of Claim 15, Johnson faults his trial counsel for failing to make sure that he was present at an *in camera* conference during which the judge, the prosecutor, and Johnson's attorneys discussed defense counsel's motion to suppress an eyewitness identification made by fourteen-year-old Michael Turner shortly after the murder. Tr. 506-29. Johnson argues that his counsel's failure to insist on his presence constituted ineffective assistance. Johnson presented this claim to the state courts in his Rule 11.42 petition. The Kentucky Court of Appeals refused to consider the claim's merits because "[t]he issue of Johnson's absence at the hearing could have been raised upon direct appeal." R. 24-47 at 10. For the reasons explained above, this application of procedural default was erroneous. The claim is not that Johnson's absence from the hearing violated his rights, but rather that this counsel were ineffective for failing to insist on Johnson's presence.

But, yet again, the Kentucky court of appeals' erroneous application of procedural default does not save this claim for Johnson. The state trial court actually rejected this claim on the merits. The trial court found "no prejudice in the fact Mr. Johnson was not present" during the *in camera* hearing. R. 24-39 at 5. It further found that "counsel would not have been aided or assisted in any manner if Mr. Johnson had been present and testified then as to everything he testified in this post conviction action." *Id.* The court therefore held that "the ruling of the Court would have been the same had Mr. Johnson been present," and thus found no prejudice from his counsel's allowing the hearing to go forward in his absence. *Id*. This determination was

reasonable. Johnson's arguments as to how his presence would have changed the outcome of the hearing and led the trial court to suppress the identification are speculative in the extreme. Johnson claims that his "extensive knowledge of automobile designs" would have proved valuable in impeaching Detective Sizemore's account that he had spread the photo array out on the hood of his cruiser for Michael Turner to view. Memo at 231. Johnson further states that he would have urged his counsel to highlight the poor visibility and Turner's subsequent uncertainty about his identification. *Id.* But the transcript of the hearing reveals that Johnson's lawyer made many of these same arguments—he emphasized Turner's youth and his limited opportunity to see the shooter. Tr. 523-24. Despite these arguments, the trial court admitted the identification after conducting an extensive analysis of the five factors set forth in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972). Tr. 525-29. Therefore, because many of the contributions Johnson claims he would have made to the hearing would either have been cumulative of arguments already made by his counsel or of *de minimis* independent value, the state trial court's conclusion that the outcome of the suppression hearing would have been the same even if Johnson had been present was not unreasonable. This claim therefore fails.

### 3. Claim that Both the State Trial and Appellate Courts Erroneously Held were Procedurally Defaulted

The final claim that the Kentucky courts did not review because of an erroneous application of a state procedural default is Claim 5(E). There, Johnson claims that his trial counsel were ineffective because they "failed to develop an adequate record concerning" the Commonwealth's failure to preserve certain physical evidence, including Brian Sizemore's truck and a wooden post in which a bullet was found. Memo at 92. In a separate claim (Claim 5(D))

discussed previously, Johnson claims that this failure to preserve evidence violated his due process rights. The Kentucky Supreme Court rejected that argument on direct appeal because Johnson had made "absolutely no showing of any bad faith" in the officers' handling of the physical evidence, *id*. at 561, which is required for there to be a constitutional violation. *See Arizona v. Youngblood*, 488 U.S. 51, 58 (1988). The basis of this ineffective-assistance claim is his trial counsel's failure to develop an adequate record concerning the missing evidence that could have demonstrated bad faith.

Johnson presented this claim in his Rule 11.42 petition, but the trial court dismissed it because "the handling of evidence associated with the truck has already been adjudicated on direct appeal by the Kentucky Supreme Court . . . and therefore is not reviewable under [Rule] 11.42." R. 24-39 at 7. The Kentucky Court of Appeals affirmed on the same ground. R. 24-47 at 8. Here again, the Kentucky courts' application of procedural default was erroneous. On direct appeal, Johnson argued that the destruction of evidence violated his due process rights. In his collateral motion, he argued that his counsel was ineffective for failing to develop an adequate record concerning the destruction of evidence. These claims are distinct, and rejecting the first does not necessarily entail rejecting the second. Indeed, the Kentucky Supreme Court rejected Johnson's due process claim, in part, because his argument that the officers acted in violation of departmental policy, and thus in bad faith, was not supported by "any proof of any [such] procedural rule or regulation" in the record. *Johnson*, 892 S.W.2d at 561. In Johnson's present claim, he argues that his counsel's failure to introduce a Kentucky State Police General Order governing the preservation into evidence was ineffective. Memo at 93. Therefore, the

Kentucky courts erroneously refused to reach the merits of this claim, despite Johnson's fair presentation.

With this claim, unlike with the previous three claims, the trial court also erroneously applied a procedural default. Therefore, because Johnson presented this claim to the Kentucky state courts and no state court adjudicated it on the merits, this Court reviews it *de novo*. *See Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003) (habeas court reviews claims that petitioner fairly presents to state courts but which state courts do not adjudicate on the merits *de novo*). This claim falls within the narrow sliver in which *de novo* review of a habeas claim is appropriate. If the petitioner fairly presents his claim to the state courts and the state courts adjudicate it on the merits, the habeas court must apply AEDPA's deferential standard of review. 28 U.S.C. § 2254(d). After *Harrington v. Richter*, 131 S. Ct. 770, 784-85 (2011), a denial of a claim without explanation is presumed to be an adjudication on the merits "in the absence of any indication or state-law procedural principles to the contrary." Therefore, if the Kentucky courts had simply denied this claim without explanation, *Richter* would command presuming that the state courts adjudicated it on the merits, thus requiring the application of AEDPA's standard of review. But because the state courts erroneously declined to adjudicate Johnson's claim in reliance on a procedural bar, *de novo* review is proper.

Unfortunately for Johnson, this claim still fails under *de novo* review. Assuming, without deciding, that his counsel's failure to develop a more complete record concerning the missing evidence constituted deficient performance, this claim falters at *Strickland*'s second prong. Johnson has not shown prejudice—i.e. a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466

U.S. at 694. That is because the trial court gave Johnson a missing-evidence jury instruction, which read:

> If you believe from the evidence that there existed certain items that were potential evidence and that agents or employees of the Commonwealth intentionally destroyed the same, you may, but are not required to, infer that these items would be, if available, adverse to the Commonwealth and favorable to the defendant.

*Johnson*, 892 S.W.2d at 561. The purpose of this instruction was to "cure any Due Process violation attributable to the loss or destruction of *exculpatory* evidence." *Estep v. Commonwealth*, 64 S.W.3d 805, 810 (Ky. 2002). And the instruction adequately incorporates *Youngblood*'s "bad faith" standard for finding a due process violation. 488 U.S. at 58. By giving this instruction the trial court, in the words of the Kentucky Supreme Court, "'bent over backwards' to be fair to [Johnson] with regard to the physical evidence issue." *Johnson*, 892 S.W.2d at 561. Therefore, because Johnson's failure to demonstrate bad faith meant that the absence of the evidence did not violate due process, and because Johnson already received the only remedy for the missing evidence that he could under Kentucky law—Kentucky courts give a missing evidence instruction in lieu of the more "onerous remedy [of] dismissal or the suppression of relevant evidence," *Estep*, 64 S.W.3d at 810; *cf. Monsanto Co. v. Reed*, 950 S.W.2d 811, 815 (Ky. 1997) ("Where the issue of destroyed or missing evidence has arisen, we have chosen to remedy the matter through evidentiary rules and 'missing evidence' instructions.")—Johnson has not demonstrated that he suffered any prejudice. Therefore, this ineffective-assistance claim also fails.

### 4.     Claim of Cumulative Error

In Claim 16, Johnson's makes a last-ditch argument that the cumulative effect of all of the errors in his case, even if insufficient when considered individually, justify granting him habeas relief when considered *in toto*. This claim fails because, as the Sixth Circuit directly held in *Williams*, "the law of this Circuit is that cumulative error claims are not cognizable on habeas because the Supreme court has not spoken on this issue." 460 F.3d at 816.

### CONCLUSION

Thus, none of the claims in Johnson's habeas petition reach the finish line. They all trip over one of the three hurdles in the path to habeas relief. The Court previously held that Johnson's amended claim regarding a "biased" judge had not been exhausted in the state courts. R. 98. Because none of his other claims warrant habeas relief, the Court will simply dismiss this lone unexhausted claim along with the rest of Johnson's petition. Accordingly, it is **ORDERED** that Johnson's petition for a writ of habeas corpus, R. 1, is **DENIED**. A separate judgment will issue.

This the 12th day of May, 2011.



Signed By:

***Amul R. Thapar***

**United States District Judge**